Thank you, Your Honor, and may it please the Court, my name is Brett Urich on behalf of Appellant John Pearl Smith, and I would like to reserve three minutes of time for rebuttal. Okay, you can do that, but just watch your own time. Please, thank you. So, Your Honor, we're asking the Court to determine that Mr. Smith was deprived of his fair cross-section of the community in his grand jury composition in violation of the Sixth Amendment. And in this case, the trial court erred in two ways by determining to the contrary. First, the trial court concluded that the disparity in this situation was not systematic because it arose from an unintentional mistake as to how the master wheel and the provisions of Alaska were used. And he said that if the, or excuse me, she said that because it was not intentional, it doesn't raise the same concerns as far as an intentional exclusion. That is not the test under Dern. Dern makes it clear that intent is irrelevant. The disparity, as far as coming from a systematic way, is focused on was it caused by the system that was utilized is what arose and made the disparity occur. And in this Court's decision in Randolph, it cites favorably to a case of the Second Circuit, United States v. Jackman, in regard to how that systematic analysis is conducted. And what happened in that situation is similar to this case in that the jury selection process arose from a mistake. In Jackman, it was a computer error where it was coding residents from certain cities as deceased. And they realized it. They found that that was a violation. And then they put together a new system that was to fix this, but the clerk was kind of mushing these two systems together and perpetuating the disparity. And so what the court said in Jackman is that this exclusion was done on a systematic nature. Here, once again, we have something that is a system utilized by the clerk. Can you address the second factor? Yes, I can address the second factor. And so in regard to the second factor, the question is whether the exclusion of the jurors was fair and reasonable in relation to the community at large. That's what Dern says. And so this Court recognized in Hernandez-Estrada that there is no one specific way of measuring that. It leaves open the idea that there's multiple ways. That's under the absolute and comparative disparity tests. And any variation here would be solidly within that guidance, right? Well, yes. If you're going from a strict absolute disparity standpoint, as far as on the relative disparity, you're looking at different percentages. I think there's only a one-ninth circuit case. The Court cites the multiple out-of-circuit as far as 54, the ones in the 50 percent range being acceptable. But I think this is an important case to think of it from why that is insufficient for the circumstances here. We're talking about a single division for a single district for the state. We're talking about a demographically diverse state. If you, and let's do it from a thought experiment standpoint. If the non-Caucasian populations of Alaska were cohesive, you have one block, Caucasian, non-Caucasian, we have more than a 10 percent disparity. What we have is 7.67 percent for Native Americans, 1.76 percent for African-Americans, 3.75 percent for Asian-Americans, and then 2.81 percent for multiracial. You add all those up, you have a more than 10 percent disparity between Caucasian and non-Caucasian. But because they are fractionalized, none of them reaches that 10 percent threshold. It's my understanding that the defense expert, it was Mr. Martin, I believe, was the expert that was proffered. He essentially testified and offered for the defense that there are essentially three possible tests, right? And one of them is absolute disparity. And it's my understanding that it's acknowledged that the study itself failed to satisfy that percentage. And that's the record, is it not? And that's correct. All right. And the second was comparative disparity. And the defendant has acknowledged and was at trial that that did not, that test did not fail. So really we're talking about the standard deviation analysis. That's what it comes down to. And the second factor, correct? That is what we think is the most appropriate for this circumstance. I mean, that's what you've argued, essentially. You've essentially argued that there's an underrepresentation of African-Americans and American Indians slash Alaska Natives. They are the categories you're saying are underrepresented. They're the ones that, when you have it as far as getting into the statistical significance, correct. There are other... And so you're here before us in terms of the standard deviation analysis in terms of the, under the, as to the second factor. Correct. I think that is the most appropriate test to use in this specific circumstance. And I think the reason to do that is, go back to first principles. We want a fair cross-section of the community. So when we have that as being the overarching standard, we're wanting to catch people from these various demographic groups. We shouldn't be using a test that is penalizing a state that has a relatively high non-white population, but it's fractionalized. And so, and the way you capture that in this situation is by relying on that standard deviation. And so, conceptually, for what standard deviation means is you think of a bell curve, right? And you have the mean result is in the middle, and then from out there you get less likely outcomes. Think of it from like a Powerball situation where, you know, millions and millions of people are playing. Most of the people are going to fall within 0, 1, 2, something along those lines as far as the amount of numbers they're getting right. Standard deviation, within three standard deviations of the mean, we're expecting to get 99.7% of the data set. And so everything beyond that is we're pushing further and further into those tails of the bell curve. And in this situation, when you calculate it out as far as for African Americans and Native Americans, we're looking at 13 and 16 standard deviations. We're talking about, essentially, you're winning the lottery to have gotten this specific grand jury composition or a veneer if you were to pull it from a random sample of the Alaska population as a whole. And so what that's demonstrating, especially when you have this situation where we're dealing with a demographically diverse district, the only way to really capture that is by using that specific analysis. And I would also point out that if you're not going to use standard deviation in this type of case, you're really saying that there's no situation where it is available. Because otherwise, we've turned this into a situation where you need to have compact, homogenous minorities to ever have a Sixth Amendment violation. Counsel, I'm going to remind you, I think you said you wanted to reserve three minutes. Yes, and I will do so right now, unless the court has any additional questions before rebuttal. Thank you. Thank you. Now I want to hear from Appellee, please. Good morning. May it please the court. Stephen Corso for the United States. This morning, we're here to ask this court to affirm the defendant's convictions. There was no systematic problem here in the composition of the grand jury. There's no need to overhaul the District of Alaska's legal practices. The system is fine. It's appropriate. It's inclusive. And that's the plan in place. True, the clerk deviated from the plan in 2015, but that has been corrected by the District Court as of 2020. The plan, of course, was to draw jurors and grand jurors on a pro rata basis, according to the number of registered voters in each division in the District of Alaska. Of course, there are five divisions, Anchorage, Juneau, Nome, Ketchikan, and I think I forgot the last one. Nome. There were five. The last is Nome, I believe.  Okay, thank you. The clerk deviated from that plan by applying a different formula than what the plan called for, and that likely skewed the demographics of the grand jury veneer, but only in a very slight manner and in a manner that did not give rise to a Sixth Amendment claim or a statutory violation here. So if the correct plan had been used, that would have increased potentially the number of white jurors in the grand jury, but only by a factor of like 1.6, right? I think that's right. The slightly increased number of white representation, very slightly increased number of African That number would actually go down. Very small numbers. As we see it, using the wrong formula decreased the number of jurors from Anchorage by 20, increased the number from Fairbanks by 31, and then reduced the number from Juneau by 6, the number from Ketchikan by 3, and the number from Nome by 2. Looking at the racial demographics of each of the divisions, take Anchorage and Fairbanks, for example, would wash out in terms of the percentage of white people on the veneer because most of Anchorage and most of Fairbanks is white. There would be a very small potential difference to African Americans, less than one or less from each of the five divisions, and as far as natives, only just a small handful. So there's a very limited realistic impact here in what the clerk did, and there's no evidence that the clerk had any intention to do anything or there's nothing in the system and the results that were generated here that would suggest that there was some sort of bias in the system that would trigger a constitutional or statutory violation. If we find that the second turn factor is not met, do we need to decide the systematic exclusion question? No. If the second factor is not met, and we fully believe that it has not been met here because there was a fair cross-section of the community in the veneer resulting in Mr. Smith's grand jury, the court would not need to address the third factor, which is whether that was a systematic cause. The court has already alluded to, under the second factor, that the statistical tests that the defendant used, absolute disparity and comparative disparity, have limitations. The court has already recognized here that the absolute disparity figures that the defense has argued are well within the thresholds, that's underneath the 10 percent threshold that the scientific community maintains, as well as quite a bit less than the 7.7 percent that this court's precedent. And that was essentially established by their own expert. The defendant's expert essentially provided testimony as to those first two, correct? That's right. That's a concession from the defense on absolute disparity, and similarly, the defense made a concession, too, we believe, on comparative disparity between the roughly 29 and 50 percent. Those are also well within limits, and of course, comparative disparity has its own flaws and limitations, which the defense and the courts have well recognized. As the court identified, this does turn, then, on standard deviation, given the concessions. No court has accepted standard deviation alone as determinative of a Sixth Amendment challenge. That's the Burgheist case from the Supreme Court. Hernandez-Estrada, from this court, has identified flaws in standard deviation because of the standard deviation relies and argues on randomness, yet the qualified jury pool was not determined randomly. It's determined by factors which exclude and excuse jurors from being qualified jurors to serve. As the district court pointed out, the standard deviation here was based on absolute and comparative disparity, and we've already, I think, well established that the absolute and comparative disparity figures from the defense were well within scientific and precedential limits, and the disparities, which we've also discussed here, were not legally sufficient because there was such a small impact to such a small handful of people in a very small sample size that there's no legal significance to any disparity that the numbers might suggest. We can move on to the third prong of Durham, which is the systematic exclusion. Our argument here is that the defense needs more data to make out a systematic argument. Their argument here is based only on one grand jury. We feel that there need to be analysis of successive grand juries to make their case. We would cite the court to the Miller decision from the Ninth Circuit, 771 F2 1219. Also in Durham, of course, there was this weekly collection of jury veneers over an eight-month period that was analyzed and led to the conclusion of disparities in Durham itself. Here, there's nothing even close to eight months' worth of weekly jury veneers. It's just one grand jury, one panel. Alaska's unique. Alaska sits essentially one grand jury per year, and that grand jury serves 12 months and sometimes is extended to 18 months. Our view is this was just a bit of a discrepancy, which was corrected. Again, there was nothing inherent in the clerk's deviation that suggests that she was targeting any specific group. And the disparities here are so small, they're nothing like the disparities in both the Supreme Court case in Taylor and the case in Durham. In Taylor, there were 53 percent of the eligible population were women, yet the women only comprised 10 percent of the jury wheel. And in Durham, the women were 54 percent of the eligible population, but only comprised 14.5 percent of the jury wheel. So those are massive numbers, massive disparities, and we have nothing close to that here. Our view is that the clerk could have continued to use her numbers and run her program and continue to deviate, and she could have easily produced a different result than the one that was obtained in Mr. Smith's jury, and that suggests that there was no Sixth Amendment or statutory violation here. Those are my remarks before the Court this morning, and unless there are any questions from the Court, I'm happy to yield the remainder of my time to the Court.  Thank you. Thank you. Thank you. So, Judge Nguyen, any questions? Does Bennett have any questions? Do you have any questions? I'm waiting for the following argument, we'll wait until, you know, no, I didn't have any other questions. Do you have any questions for me before I go on? Yeah, I guess I do, really, in terms of the second factor under Doran, when all is said and done, in terms of, for it to reach an unconstitutional level, you know, the burden is to show that it was not fair and reasonable, and it really sounds like there was a minimal effect here. How is this not ultimately fair and reasonable, even when, as noted by Judge Nguyen's earlier question, even if the correct geographic poration had been utilized, it's a very minimal increase in greater representation of one category, and actually diminishes and is less than would result from American Indian and Alaska Native jurors. I just don't know how this rises to a constitutional level of not being fair and reasonable under Doran. And I would encourage your Honor to look at 1ER15, which is the district court's order, and it's got this, it's got the table there showing what the disparities are between the district, the district-wide eligibility jurors versus what was done from the selected pool and then what the actual 125 selected. They add up. You can sit there and see that district-wide it should have been 71.36 percent of white jurors. In fact, it was 83.06. We're talking about once you add all those up, and again, we're trying to get that fair cross-section. Fair and reasonable. Fair and reasonable. Correct. Not a precise formula. It's fair and reasonable. That's the standard, is it not? That is absolutely the standard, and we don't think that it is fair and reasonable when you look at all of those, it's almost a death by a thousand cuts of like, okay, any one specific demographic might not reach the absolute disparity, doesn't in this case. The closest we get is Native Americans at the over 7 percent, but doesn't get to 10, and so, but all those you add up, there ends up being a pretty significant disparity, and we're talking about 31 jurors out of 125 being taken from Fairbanks. That's almost a quarter of the grand jury composition. We're talking about a very significant disparity once you add everything up, and if you're trying to get down to, is this a couple people here or there, that is inherent in the fact of we're taking small sample sizes, whether that's a grand jury veneer, whether that's a pettit jury veneer, whether that's 12 jurors on a jury. At the end of the day, unless you just have a massive thing such as, you know, males versus females, 50 percent of the population, it's always going to come down to a couple of people, and if you're not doing it in this situation, you're effectively rendering Sixth Amendment violations a nullity because you need that homogenous and compact minority for it ever to be violated, and I'm out of time. Thank you. Thank you.  Thank you, counsel. I'm sorry. I need another stand. I can't find the T-sheets. Okay, the Smith case is now submitted.
judges: GOULD, NGUYEN, Bennett